No. 2—07—0139
Opinion filed March 31, 2011

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04—CF—2042 |
| TERRY L. HEINZ, | ) ) ) | Honorable Philip L. DiMarzio, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Zenoff and Schostok concurred in the judgment and opinion.

**OPINION**

Following a bench trial, defendant, Terry L. Heinz, was convicted of burglary (720 ILCS 5/19—1(a) (West 2004)) and theft (720 ILCS 5/16—1(a)(1)(A) (West 2004)). Based on defendant's prior felony convictions, the trial court found him subject to Class X sentencing (730 ILCS 5/5—5—3(c)(8) (West 2004)). Defendant was sentenced to concurrent terms of 10 years' imprisonment for the burglary conviction and 5 years' imprisonment for the theft conviction, and he was ordered to pay $7,000 in restitution.

On appeal, defendant argued that: (1) his conviction of and sentence for theft must be vacated because theft is a lesser included offense of burglary; (2) his sentencing hearing was unfair because the trial court erroneously found that no statutory factors in mitigation applied; (3) the trial court

improperly ordered restitution in the amount of $7,000; and (4) the mittimus should be corrected because he was entitled to a credit for three days' time served in custody prior to sentencing. We initially vacated the conviction of, and sentence for, theft, concluding that under the charging instrument approach enunciated in *People v. Baldwin*, 199 Ill. 2d 1, 7 (2002), theft was a lesser included offense of burglary. We also vacated the order of restitution and remanded the cause for a hearing on the amount of actual damages, and we corrected the mittimus to reflect three days' credit for time served. *People v. Heinz*, 391 Ill. App. 3d 854 (2009). The Illinois Supreme Court issued a supervisory order on November 24, 2010, which directed us to vacate our order and reconsider our decision in light of *People v. Miller,* 238 Ill. 2d 161 (2010). *People v. Heinz*, 238 Ill. 2d 662 (2010) (table). We now affirm defendant's convictions and sentences for burglary and theft, vacate the restitution order, and remand the cause for a hearing on the actual damages. Additionally, we order the mittimus corrected to reflect three days' credit for time served. We also grant the motion of the State to assess the $50 statutory assessment as costs of the appeal.

## I. BACKGROUND

On March 23, 2005, defendant was indicted for the offenses of burglary (720 ILCS 5/19—1(a) (West 2004)) and theft of property having a value in excess of $300 (720 ILCS 5/16—1(a)(1)(A) (West 2004)). Specifically, the burglary indictment alleged that "defendant without authority, knowingly entered a building of Liberty Lanes, located at 115 Meadowdale Drive, Carpentersville, Kane County, Illinois, with the intent to commit therein a theft." The indictment for theft alleged that "defendant knowingly exerted unauthorized control over property of Liberty Lanes being United States currency having a total value in excess of $300.00 intending to deprive Liberty Lanes permanently of the use of the property."

At trial, Cheryl Mikolitis, owner of Liberty Lanes bowling alley in Carpentersville, testified that she was at work at the bowling alley on the evening of October 11, 2004. She left around 10:30 p.m. Her employees, Kevin Miller and Steve Tuman, remained to clean up and close for the night. When she arrived at the bowling alley on the morning of October 12, she discovered that her office door was open and the door frame was damaged. A safe containing approximately $2,400 in cash and $300 in checks was missing, as well as two boxes containing 20 cartons of cigarettes.

Kevin Miller testified that he was the assistant manager of the bowling alley. His duties included closing after all the customers had left. This entailed counting the receipts, checking the building and doors, and, on October 11, supervising Steve Tuman, who was filling in for a regular employee. Miller stated that, during the evening of October 11, Matt Peters and his wife, Ellen, sat at the bar for a while, watching him work. Miller had been introduced to them a few days earlier. They left around 10 p.m.

Miller stated that around midnight defendant came inside to use the bathroom after the bowling alley was closed. Defendant was waiting for Steve Tuman to give him a ride home. After defendant left, Miller checked the building and then went home.

Steve Tuman testified pursuant to an agreement with the State. He had known defendant for about 12 years; in October 2004 defendant was living in his basement. He stated that, about two months prior to October, he had discussed burglarizing Liberty Lanes with defendant and with Matt and Ellen Peters. According to Tuman, the burglary was defendant's idea. Tuman said that Matt and defendant approached him because he worked at the bowling alley. Tuman's role in the burglary was to let Matt in through the back door. The plan was for Matt to hide inside while Tuman completed his chores for the night. Then Tuman was to leave with Kevin Miller after they finished their work.

Tuman testified that, even though there was money in the cash registers, their plan was to steal only two safes. Matt was supposed to take the safes to the back door and then wait for help. Defendant was to act as lookout from the parking lot.

Tuman further testified that, on the night of the burglary, Matt and Ellen Peters arrived at the bowling alley around 6 p.m. and sat at the bar. They left around 10:30 p.m., when the bowling alley closed. Tuman testified that Matt then went around to the back of the building and Tuman let him in. Matt hid inside the bowling alley, above the mechanic's room. Defendant came to the door and asked to be let in to use the bathroom, which was not part of the plan. After defendant left, Tuman and Miller finished closing and left at the same time. Tuman got into defendant's car; Ellen was already there. By radio, defendant told Matt that everything was clear. Tuman then went to the back door of the building and helped Matt remove one safe, which they put in Matt's truck. The plan was to steal another safe, but it was too heavy. Matt also stole about 20 cartons of cigarettes. Tuman testified that he and Matt drove Matt's truck to Tuman's house. Defendant and Ellen followed in defendant's car. At Tuman's house, defendant cut open the safe, which contained keys, tapes, checks, and $1,000 in cash. Tuman testified that he and Matt then drove to McHenry County to dispose of the safe; afterward they met defendant and Ellen at a truck stop where they split up the cigarettes and defendant counted and distributed the cash.

Detective Todd Shaver of the Carpentersville police department investigated the burglary. He spoke to Cheryl Mikolitis and her husband, and to Steve Tuman, who was then held for investigation. He also interviewed Matt Peters at the McHenry County jail. After that he called defendant, who agreed to come to the police station.

The next day, defendant arrived with Ellen Peters. Shaver talked to her first. Shaver then advised defendant of his *Miranda* rights. Defendant signed a waiver of his rights and gave a statement. Shaver testified that defendant initially told him that on the night of the burglary he picked up Steve Tuman at work and drove him home to Woodstock. After Shaver told defendant that Steve Tuman and Matt and Ellen Peters had implicated him in the burglary, defendant said that Ellen was with him when he picked up Tuman from the bowling alley around midnight. Defendant said that they drove to a gas station and then returned to Liberty Lanes, where they dropped Tuman off at the rear of the building. Defendant and Ellen then parked in a parking lot across from the bowling alley and used a two-way radio to talk to Tuman. Defendant told Shaver that Matt Peters and Tuman came out of the building carrying a small safe, which they loaded into the back of Matt Peters' truck. They all drove to Tuman's house in Woodstock, where the safe was opened by Matt Peters and Tuman. The cash that was inside the safe was divided among the three men. Defendant said that he received $411. Defendant told Shaver that he did not go inside the building and that his only involvement in the incident was with the two-way radio.

Defendant testified on his own behalf. He stated that in October 2004 he was living in Tuman's basement. On the night of October 11, Tuman called him around 10:30 p.m., asking for a ride home from work. Defendant arrived at the bowling alley just before midnight and asked Kevin Miller to let him in the building to use the restroom. Defendant testified that as he returned to his car he saw Ellen in the parking lot. She got into defendant's car. Shortly thereafter, Tuman and Miller came out of the bowling alley. Tuman entered defendant's car and told him to go to a nearby gas station. At the gas station Tuman told defendant they had to go back to get Matt Peters. Defendant

parked across the street from the bowling alley. As Tuman got out of the car, he threw his two-way radio phone onto the seat and ran across the field toward the bowling alley.

Defendant testified that he and Ellen stayed in the car. After about 10 minutes Tuman called on the radio phone and said, "I'm ready to go, are you ready?" Defendant replied, "I guess so." Defendant followed Matt Peters' truck to Tuman's house. After they arrived at Tuman's house, defendant saw Matt Peters and Tuman sitting in the garage with a safe. Defendant testified that he then left with Ellen, and he denied cutting the safe open.

Defendant was convicted of burglary and theft. In its ruling the trial court stated:

"He is legally accountable. He is guilty of burglary. I find him guilty of burglary.

He is also guilty of Count 2, theft. It is not a lesser included offense.

Now, I believe that only one of these two convictions can stand under the one-act one-crime rule; however, I will today enter judgments on both, and I will hear any arguments that either side wishes to make in that regard at a future date."

At the sentencing hearing, the State conceded that statutory mitigating factors numbers one and two applied to defendant (730 ILCS 5/5—5—3.1(a)(1), (a)(2) (West 2004)). The State asked for restitution, relying on an unnotarized document signed by a "James Mikolaitis [*sic*]" that claimed losses of approximately $7,000. The items "damaged, lost or stolen" were listed as follows:

"$2850 CASH — 18-20 CARTONS CIGS [*sic*] ($720.00)

($130.00) 10 CASES BEER — SAFE WORTH $800.00 — BACK-UP TAPES COMPUTER

2 BEER PUMPS — TOOLS ($100.00)

6-DOORS (REPAIR + REPLACE) $2200.00

SAFE INSTALLED $800.00

TOTAL ABOUT $7000.00"

This list was handwritten on a letter from the State's Attorney's office, addressed to "Liberty Lanes c/o Cheryl Mikolaitis [*sic*]." The letter requested the information and included the statement that the victim's "insurance needs to be exhausted first." The documentation attached included receipts from Elgin Key for $685.33; Elgin Key for $109.96; Menards for $183.07, with some items crossed off and "$169.00 Total" handwritten; and M&M Remodeling for materials and labor totaling $1,905. Also attached was an unsigned list of items and dollar amounts handwritten on blank paper with the Liberty Lanes address stamped at the top. The above were included in "People's Exhibit #1."

The trial court sentenced defendant to 10 years' imprisonment for the burglary conviction and to 5 years' imprisonment for the theft conviction, to be served concurrently. The court also ordered defendant to pay $7,000 in restitution.

In his motion to reconsider the sentence, defense counsel argued that the sentence of 10 years' imprisonment was cruel and unusual punishment, in violation of the Constitution of the United States, and did not provide for any possibility of rehabilitation, in violation of the Constitution of the State of Illinois. The trial court denied the motion to reconsider.

This appeal followed.

## II. ANALYSIS

### A. Theft as Lesser Included Offense

Defendant contends that his conviction of and sentence for theft must be vacated because both of his convictions stemmed from the same October 11, 2004, incident and because the charged burglary offense was predicated upon defendant's alleged intent to commit a theft when he entered

the building. Therefore, he avers, the theft is a lesser included offense of the burglary, and his theft conviction cannot stand.

Defendant acknowledges that this issue was not raised in a posttrial motion; however, this issue is reviewable under the plain-error rule, which permits a reviewing court to consider a trial error not properly preserved in a criminal case when either the evidence is closely balanced or the error is so fundamental and of such magnitude that the accused was denied a right to a fair trial. See Ill. S. Ct. R. 615(a) (eff. Aug. 27, 1999); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Because "an alleged one-act, one-crime violation and the potential for a surplus conviction and sentence affects the integrity of the judicial process, thus satisfying the second prong of the plain error rule" (*People v. Harvey*, 211 Ill. 2d 368, 389 (2004)), we will address the issue of whether theft is a lesser included offense of burglary such that defendant's conviction of and sentence for theft should be vacated.

"Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses." *People v. King*, 66 Ill. 2d 551, 566 (1977). In the recent case of *People v. Artis*, 232 Ill. 2d 156 (2009), our supreme court declined to abandon the "one-act, one-crime" doctrine of *King*, stating:

"[U]nder *King*, a court first must determine whether a defendant's conduct consists of one act or several acts. Multiple convictions are improper if they are based on precisely the same physical act. If the defendant's conduct is based on more than one physical act, a court must then determine whether any of the offenses are lesser-included offenses. If they are, then multiple convictions are improper." *Artis*, 232 Ill. 2d at 165.

We cannot say that the unauthorized entry and the subsequent taking involved here should be considered "one act" for purposes of the *King* doctrine. Therefore, we turn to our determination of whether the theft is a lesser included offense of the burglary.

To determine whether theft is a lesser included offense of burglary, we must utilize the abstract elements approach, enunciated in *Miller*, 238 Ill. 2d 161, under which we examine the statutory elements of the charged offenses to determine whether theft is a lesser included offense of burglary. The burglary indictment alleged that "defendant without authority, knowingly entered a building of Liberty Lanes, located at 115 Meadowdale Drive, Carpentersville, Kane County, Illinois, with the intent to commit therein a theft." The indictment for theft alleged that "defendant knowingly exerted unauthorized control over property of Liberty Lanes being United States currency having a total value in excess of $300.00 intending to deprive Liberty Lanes permanently of the use of the property." In *Miller*, our supreme court concluded that "[w]hen charged offenses are at issue, a defendant has notice of what the State seeks to convict him of and is able to prepare and present a defense" (*id.* at 174); in short, notice is not an issue. Further, the abstract elements test ensures that defendants are held accountable for the "full measure of their conduct" and the consequential harm caused. *Id.* at 174. Had the legislature intended that a defendant could be convicted of only one of two separate offenses where they are based on conduct that occurred during the same criminal transaction, "it clearly could have said so." *Id.* at 173. Accordingly, our supreme court concluded that there is no reason to apply the charging instrument approach when a defendant is charged with multiple offenses and the issue is whether, under *King*, one offense (theft) is a lesser included offense of the other (burglary).

The proper analysis here is to look at the statutory elements of the charged offenses to determine whether "all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense." *Id.* at 166. Burglary requires a knowingly unlawful entry into a building with the intent to commit a theft therein; it does not require a "taking" of property with the intent to permanently deprive the owner of the property as does theft. *Id.* at 176.

Therefore, under the holding articulated in *Miller*, defendant's theft in the instant case is not a lesser included offense of his burglary. Accordingly, we affirm defendant's theft conviction and sentence of five years' imprisonment, to be served concurrently with his sentence of imprisonment for the burglary conviction.

### B. Restitution Order

Defendant also contended that errors in the restitution order must be reviewed because defense counsel was ineffective by failing to object to the order and failing to raise the issue in the motion to reconsider the sentence. Alternatively, defendant raised plain error. We found that defendant was prejudiced as a result of defense counsel's inaction; the trial court ordered him to pay restitution in the amount of $7,000, not a small sum of money. We also noted that it was improper to make defendant's liability for restitution joint and several with the other defendants without indicating what the total liability might be.[1] Therefore, we determined that, under the standard set

---

[1]Two codefendants pleaded guilty in different proceedings and received sentences of probation with restitution, but the record does not reveal the amount of restitution. Therefore, we do not know the total amount of joint and several liability, if it is redundant or conflicting with the order and evidence presented here.

forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), counsel was ineffective, and we vacated the order of restitution and remanded for a new restitution hearing on the actual damages. We have considered the impact of *Miller*. *Miller* does not alter our prior analysis, and the analysis and conclusion are adopted *de novo*.

### C. Sentencing Credit

Defendant contended that he is entitled to credit toward his sentence for three additional days spent in custody from the day of his arrest through October 29, 2006, the day he was released on bail. The presentence report states that defendant was arrested on October 27, 2006. When a defendant is in custody for any portion of a day, he is entitled to credit for that day toward his sentence. 730 ILCS 5/5—8—7(b) (West 2004); *People v. Dominguez*, 255 Ill. App. 3d 995, 1005 (1994). The State conceded that defendant is entitled to credit for three additional days in custody.

Supreme Court Rule 615(b)(1) allows this appellate court to modify the sentencing order without remand to reflect credit for the amount of time served in presentence custody. Ill. S. Ct. R. 615(b)(1) (eff. Aug. 27, 1999); *People v. Bussan*, 306 Ill. App. 3d 836, 840 (1999). Therefore, we modified the mittimus to reflect credit for three additional days spent in custody. We have considered the impact of *Miller*. *Miller* does not alter our prior analysis, and the analysis and conclusion are adopted *de novo*.

### D. Statutory Assessment

Finally, the State has requested attorney fees pursuant to section 4—2002(a) of the Counties Code (55 ILCS 5/4—2002(a) (West 2008)). Under *People v. Kitch*, 239 Ill. 2d 452 (2011), we grant to the State the statutory assessment of $50 against defendant as costs of this appeal. See 55 ILCS 5/4—2002(a) (West 2008). As the *Kitch* court explained, section 4—2002 of the Counties Code

provides that a State's Attorney is entitled to a fee of $50 "[f]or each case of appeal taken from his county *** to the Supreme or Appellate Court when prosecuted *** by him." 55 ILCS 5/4—2002(a) (West 2008). Here, the State's Attorneys Appellate Prosecutor (SAAP) defended the appeal. Under the applicable statutory scheme, any case in which SAAP appears is, by necessity, prosecuted or defended by a State's Attorney. See 55 ILCS 5/3—9005 (West 2008) (it is State's Attorney's duty to commence and prosecute all criminal actions arising out of his or her county). Moreover, under section 4.01 of the State's Attorneys Appellate Prosecutor's Act, SAAP attorneys are authorized to "represent the People of the State of Illinois" in the appellate court "when requested to do so and at the direction of [a] State's Attorney." 725 ILCS 210/4.01 (West 2008). Under this statute, a State's Attorney retains a central role in an appeal even where he uses SAAP's services, and SAAP attorneys may prepare, file, and argue briefs in the appellate court with the advice and consent of the State's Attorney. Therefore, we grant the State's Attorney a $50 fee under section 4—2002(a) of the Counties Code.

For the foregoing reasons, we affirm defendant's convictions and sentences for burglary and theft. We modify the mittimus to reflect three days' credit for time defendant spent in custody. The order of restitution is vacated; we remand the cause for a hearing on the actual damages. Finally, we grant the State its $50 statutory assessment as costs of this appeal.

Affirmed as modified in part and vacated in part and cause remanded; statutory assessment of $50 entered against defendant.